# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| ALAMEDA RESEARCH LTD.,WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-_____(JTD) |
| SAMUEL BANKMAN-FRIED, NISHAD SINGH, and ZIXIAO "GARY" WANG, | |
| Defendants. | |

### COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS AND OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105, 544, 547, 548, AND 550 AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305 AND FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502

Plaintiffs Alameda Research Ltd. ("Alameda"), West Realm Shires, Inc.

("WRS"), and West Realm Shires Services, Inc. ("WRSS") (together, the "Plaintiffs"), through

their undersigned counsel, for their Complaint against Samuel Bankman-Fried, Nishad Singh,

and Zixiao "Gary" Wang (together, the "Defendants"), state as follows:

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

## NATURE OF THE CASE

1.      Plaintiffs bring this adversary proceeding pursuant to Sections 105, 544, 547, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305, to avoid and recover from Defendants, or from any other person or entity for whose benefit the transfers were made or obligations incurred, transfers of simple agreements for future equity ("SAFEs") dated as of July 25, 2022, and September 30, 2022, as well as transfers of WRS common stock on November 14, 2022, and all other transfers of property of Plaintiffs and all obligations of Plaintiffs to Defendants, coinciding with or prior to commencement of the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").

2.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022 [D.I. 128]. Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to prosecute, this adversary proceeding.

3.      Prior to the filing of the Chapter 11 Cases, Alameda was a cryptocurrency trading firm owned by Samuel Bankman-Fried and Gary Wang.  Caroline Ellison was initially co-CEO

and later the sole CEO of Alameda.  WRS is a Delaware holding company owned by Samuel Bankman-Fried, Nishad Singh, and Gary Wang, with a number of subsidiaries, including WRSS, which did business as FTX.US, the cryptocurrency exchange founded by Bankman-Fried, Singh, and Wang to offer cryptocurrency trading services to U.S. customers.  Embed Financial Technologies Inc. ("Embed") is a stock clearing firm and FINRA licensed broker-dealer founded by Michael Giles.

4.      On or about March 15, 2022, WRS began discussions to acquire Embed, ostensibly in order to provide FTX.US customers with the ability to trade stocks, in addition to cryptocurrency, on the FTX.US exchange platform.  The contemplated product was to be called FTX Stocks.

5.      Through a series of self-dealing transactions orchestrated by Bankman-Fried, Ellison, Singh, and Wang (hereinafter, the "FTX Insiders"), WRS paid the holders of Embed equity (*i.e.*, shares, options, and SAFEs) (hereinafter, the "Embed Equity Holders")[2] $248,010,467.02 of misappropriated FTX Group[3] funds to acquire their equity interests in Embed on or around September 30, 2022—mere weeks before the Petition Date.  As part of the transaction, the FTX Insiders caused WRS to issue SAFEs in WRS to Bankman-Fried, Singh,

---

[2]     Although SAFEs are entitlements to receive equity upon the occurrence of a future conversion event, Plaintiffs are categorizing holders of SAFEs as Embed Equity Holders for purposes of this complaint for ease of reference.  Two separate adversary proceedings are being filed contemporaneously against two groups of former Embed Equity Holders:  (i) Rocket Internet Capital Partners II SCS, Rocket Internet Capital Partners (Euro) II SCS, GFC Global Founders Capital GMBH, GFC Global Founders Capital GMBH & Co. Beteiligungs KG Nr. 1, William Hockey Living Trust, and 9Yards Capital Investments II LP, and (ii) the remaining Embed Equity Holders and former employees of Embed.

[3]     The FTX Group is comprised of four silos.  These silos include:  (a) a group composed of Plaintiffs and Debtors WRS, WRSS, and their Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiff and Debtor Alameda, Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

and Wang, which by their terms converted into WRS common stock upon the filing of the Chapter 11 Cases.

6.      Plaintiffs have determined, based on their analysis and investigation to date, that all of the aforementioned transfers and obligations are avoidable under the Bankruptcy Code and Title 6 of the Delaware Code.

7.      Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants have relinquished to Plaintiffs all property that they received in transfers that are determined by the Court to be avoidable and/or recoverable.

8.      During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Plaintiffs intend to avoid or recover all such transfers, and to avoid all such obligations, made to or for the benefit of Defendants or any other transferee and accordingly reserve the right to amend this Complaint.

## **THE PARTIES**

9.      Plaintiff Alameda is a British Virgin Islands company limited by shares.  It is a wholly-owned subsidiary of Debtor Alameda Research LLC, a Delaware limited liability company that is 90% owned by Defendant Bankman-Fried and 10% owned by Defendant Wang.

10.      Plaintiff WRS is a Delaware corporation 52.99% owned by Defendant Bankman-Fried, 16.93% owned by Defendant Wang, 7.83% owned by Defendant Singh, and 22.25% owned by other shareholders.

11.      Plaintiff WRSS, doing business as FTX.US, is a Delaware corporation and a wholly-owned subsidiary of Plaintiff WRS.

12.     Defendant Samuel Bankman-Fried is a co-founder of Plaintiff Alameda and was its sole director until September 6, 2022.  He is also a co-founder of Plaintiffs WRS and WRSS, and was previously the CEO and sole director of Plaintiff WRS.

13.     Defendant Nishad Singh is a co-founder of Plaintiffs WRS and WRSS.

14.     Defendant Gary Wang is a co-founder of Plaintiffs Alameda, WRS, and WRSS.

## OTHER RELEVANT PERSONS

15.     Michael Giles is the founder of Embed and served as CEO of the company until February 2023.

16.     Caroline Ellison was the co-CEO of Plaintiff Alameda from August 2021 until September 2022, when she was named the sole CEO and director.

## JURISDICTION AND VENUE

17.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

18.     This adversary proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

19.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

20.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

21.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

22.     The statutory predicates for the relief requested herein are Sections 105(a),

502(d), 544, 547, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of

the Delaware Code.

23.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure

of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry

of final orders and judgments by the Court on these claims to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments consistent

with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

**I.      The FTX Insiders Defrauded Investors, Creditors, and Customers To Make Self-
         Dealing Transfers and Acquire Embed.**

24.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and

trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group

faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an

emergency basis on November 11 and 14, 2022.  Additional factual background relating to the

FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the

*Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I.

24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day

Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day

Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First

Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

25.     The FTX Insiders, among others, took advantage of the FTX Group's lack of

controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's

assets on, among other things, private homes and jets, political and "charitable" contributions, and various investments.  The acquisition of Embed was one such transaction.

26.     All of the funding for the Embed acquisition came from Alameda, which, at the FTX Insiders' direction, had surreptitiously and unlawfully diverted and transferred assets belonging to FTX.com, the principal international cryptocurrency exchange operated by the FTX Group, to spend on the FTX Insiders' pet projects.  By causing Alameda to take money belonging to FTX.com and spend it on the FTX Insiders' pet projects, the FTX Insiders defrauded FTX.com's creditors, including customers and investors.

27.     The FTX Insiders purportedly pursued the Embed acquisition because they believed it would help expand FTX.US's operations into conventional securities markets, thereby enriching themselves as WRS shareholders.  In pursuing the Embed acquisition, the FTX Insiders prioritized speed above all else.  They performed almost no due diligence on Embed and accepted the significant terms proposed by Giles, Embed's founder, CEO, and sole representative during the negotiation, who personally received approximately $157 million in connection with the acquisition.  As a consequence, WRS paid far more than fair or reasonably equivalent value for Embed, and awarded Giles an extravagant and unwarranted retention bonus as an incentive to complete the acquisition quickly.

28.     All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that facilitated the acquisition of Embed.  On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud; Ellison also pleaded guilty to conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19, 2022, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On

February 28, 2023, Singh pleaded guilty to the same felonies as Ellison and to conspiracy to make unlawful political contributions and defraud the Federal Election Commission. *See* Min. Entry, Feb. 28, 2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).

29.    In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (*i.e.*, government issued) currencies and cryptocurrencies. Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21. Using these "special privileges," the FTX Insiders frequently caused Alameda to misappropriate funds from the FTX exchanges for their own benefit, including to make acquisitions like Embed.

30.    Bankman-Fried has repeatedly, and publicly, stated that Alameda operated as "a wholly separate entity" from FTX.com. *See* Annie Massa et al., *Sam Bankman-Fried and Alameda CEO Caroline Ellison Spoke About Red Flags at FTX 3 Months Before It Collapsed. Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022, 5:58 AM), https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-flags-ftx-3-months-before-it-collapsed-what-said-how-lied/. Ellison was quoted as saying that "[w]e keep them [FTX and Alameda] quite separate in terms of day-to-day operations." *Id.* In reality, however, the FTX Insiders routinely, and secretly, used Alameda to loot "several billion dollars" from FTX.com using the "special privileges," thereby defrauding FTX.com's creditors, including customers and investors. Plea Tr. 28:23-29:2, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102; Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.

31.     Bankman-Fried also conspired with Ellison and others to divert funds to Alameda that were intended to be deposited at FTX.com before they reached the exchange, so that the FTX Insiders could use those funds to enrich themselves.  Beginning in 2019 and continuing through 2022, Bankman-Fried caused FTX.com customers to deposit funds into bank accounts controlled by Alameda, without disclosing to the banks that held those accounts or to FTX.com customers the nature of the arrangement between FTX.com and Alameda.  *See* Superseding Indictment ¶ 15, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

32.     Bankman-Fried exposed this aspect of the fraud at FTX in the days leading up to the Petition Date, when he supplied potential investors with a purported Alameda balance sheet. *Id.* ¶ 56.  This document included a liability of $8 billion in a "Hidden, poorly internally labled [sic] 'fiat@' account."  *Id.*  However, Bankman-Fried "well knew" that this liability reflected "FTX customer fiat deposits accepted into Alameda's bank accounts that had not been maintained for the benefit of customers or repaid to FTX[.]"  *Id.* ¶ 57.  These funds were used by the FTX Insiders "to make investments in the name of Bankman-Fried and his associates, rather than in the name of Alameda."  *Id.* ¶ 26.

33.     By approximately July 2022, after the definitive agreement for the Embed acquisition had been signed, Ellison had conspired with Bankman-Fried to "provide materially misleading financial statements to Alameda's lenders," such as the above-referenced balance sheet, "that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties."  Plea Tr. 28:9-16, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 19.  Ellison also agreed with Bankman-Fried and others "not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement."  *Id.* at 28:19-21.

34.     The FTX Insiders were aware at all relevant times of the "special privileges on the FTX platform" that allowed Alameda to "borrow" (*i.e.*, loot) billions of dollars from FTX.com in order to, *inter alia*, finance "loans" from Alameda to the FTX Insiders.  Ellison admitted that she was aware of this arrangement from 2019 through 2022, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral . . . pay interest . . . or being subject to margin calls or FTX.com's liquidation protocols."  *Id.* at 27:11-15.

35.     In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another."  *See* Superseding Indictment ¶ 53, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

## II.    Minimal Due Diligence and Inflated Retention Bonuses Led to Severe Overpayment to Embed Equity Holders.

36.     WRS began negotiations with Giles to acquire Embed at the end of March 2022, when Giles visited the FTX headquarters in The Bahamas.  While there, Giles wrote to a senior Embed employee that the President of FTX.US had told him that they were empowered to write a check "tomorrow" if they agreed to deal terms.  Giles added:  "Obviously joking[,] but I think they would move fast[.]"

37.     By April 15, 2022, WRS and Embed had signed the "Memorandum of Terms," which ascribed a $220 million enterprise value to Embed and provided for $75 million in retention bonus payments to Embed employees, including $55 million to Giles.  The "Agreement and Plan of Merger" containing substantially the same terms was signed as of June 10, 2022. When the transaction closed on September 30, 2022, WRS paid the Embed Equity Holders

$248,010,467.02 of misappropriated FTX Group funds to acquire their interests in Embed, which included shares, options, and SAFEs.  Just six weeks later, Alameda, WRS, and WRSS filed for Chapter 11 after it came to light that the FTX Insiders were engaged in a scheme to defraud creditors, including customers and investors.  Although the acquisition process spanned approximately six months, from April 2022 through September 2022, most of that time was spent securing regulatory approvals for the acquisition.  The essential terms of the transaction were negotiated and agreed upon in only two weeks.

38.     The $220 million enterprise value of Embed that WRS agreed to for purposes of the acquisition was proposed by Giles based on little more than his representation that it would "enable [him] to get a deal over the line with investors."  WRS did not retain an investment bank or any other outside advisor to conduct a valuation analysis of Embed, nor did it require Giles to make detailed representations about Embed's value as a going concern or as a future subsidiary of WRS.  WRS and Embed did not set up a "data room" for information sharing until weeks after the term sheet had been signed and, even then, WRS did not perform any meaningful due diligence concerning Embed's purported value or its crucial technology.

39.     When Giles was asked on April 19, 2022 by another senior Embed employee about the expected diligence process with WRS, Giles responded, "I don't think they are too worried."  According to Giles, WRS representatives had told him that they did not need to perform due diligence because a WRS subsidiary was already an Embed customer, although that relationship was barely a few months old and had not been fully implemented.  On that same day, Laurence Beal, Embed's Chief Technology Officer, asked another senior employee whether she had "an idea of what [WRS] want to do for due diligence."  After the other employee replied, "No, not yet," Beal said that WRS "didn't do a ton of dd [due diligence]" before its subsidiary

became a customer of Embed.  He then added:  "I get a sense that they are [cowboy emoji] over there[.]"

40.     The decision by WRS to forgo due diligence was extremely consequential.  On May 9, 2022, a senior Embed employee wrote to Brandon Mann, a software engineer at Embed, that she was "so concerned with how many bugs" the President of FTX.US had noticed in Embed's platform.  On May 10, 2022, Giles wrote to the same senior employee that "what will blow up the deal [with WRS] will be death by a thousand cuts issues with tech."  According to Giles, Embed's platform was "experiencing multiple issues per day."  That employee replied to Giles that "deep down, it's why I want to accelerate the signing of the DA [definitive agreement with WRS] . . . more issues are inevitable."  Giles replied that "there shouldn't be this many issues."

41.     On June 27, 2022, just a few weeks after WRS and Embed signed the definitive acquisition agreement, Beal and another senior employee exchanged messages regarding the Embed platform's inability to handle approximately 600 new user accounts as part of the gradual release of FTX Stocks, even though the "launch plan" called for Embed to handle 10,000 new accounts by that time.

42.     Beal acknowledged that WRS would not "pony up money to buy [Embed] if they thought we couldn't handle 1K accounts" and asked the other employee how many accounts Embed could handle given the FTX Stocks "launch plan" target of 10,000 new accounts.  That employee replied to Beal that the platform "can't really take ANY accounts . . . I get MG [Michael Giles] has to basically lie to get the deals he gets, but there's fallout, and we aren't managing it[.]"  Beal characterized the other employee's statement about Giles as "[f]air."  A faulty technology platform that could not handle "any" new accounts, let alone the 10,000 that

WRS was anticipating, was not worth a fraction of what WRS got snookered into paying for Embed.

43.     An unaudited statement of financial condition for Embed as of March 31, 2022, which was included in the closing documents for the acquisition, reflects that Embed had total assets of approximately $37 million and a mere $25,000 in net revenue.  Embed Clearing LLC, a wholly-owned subsidiary of Embed, had never reported any revenue at all.  Although Giles asserted that Embed was worth $220 million at that time, he revealed to a reporter at the *Wall Street Journal* on May 19, 2022 that a WRS subsidiary was Embed's "first big client."  As a multiple of revenue, the purchase price that WRS paid for Embed was astronomical, particularly in view of Embed's minuscule customer base and the serious bugs plaguing its software platform at the time of the acquisition.

44.     To incentivize speedy negotiations, WRS not only agreed to pay an inflated price of $220 million for Embed, it also agreed in both the April 15, 2022 Memorandum of Terms and the June 10, 2022 Agreement and Plan of Merger to pay Giles a retention bonus of $55 million—one-quarter of Embed's purported value.  The stated purpose of that $55 million payment was to retain Giles as CEO through the acquisition's closing, though he was not obligated to stay in his role beyond that date.  The result was that, between the signing of the acquisition agreement on June 10, 2022 and the closing of the acquisition on September 30, 2022, Giles was being paid approximately $490,000 *per day*, assuming he worked seven days every week.  By contrast, during 2022, Giles' salary as Embed's CEO was $12,500 *per month*.  And the $55 million retention bonus awarded to Giles was on top of the approximately $103 million that Giles received at closing as Embed's largest shareholder.

45.     This unusual arrangement did not go unnoticed by Embed's other shareholders; a representative of Embed's second-largest shareholder, Propel Venture Partners, told Giles directly that he "ha[d] never seen so much of a deal this size go to a founder . . . just unusual proportions."  Another representative of Propel Venture Partners indicated that he hoped Giles was getting paid in cash in light of turmoil in the cryptocurrency markets, stating:  "Hopefully[] there's limited risk to cash exchanging hands given what's going on in the crypto/broader markets."

46.     Although numerous Embed employees were awarded retention payment agreements, Giles was the only one who was paid his full retention bonus on the September 30, 2022 closing date.  The other employees, who were not involved in the negotiations, were obligated to remain at Embed for two years after closing in order to receive their full bonuses.[4] Giles knew that the deal he cut for himself was too good to be true, and he was afraid that the other Embed Equity Holders would notice.  On June 23, 2022, Giles asked a senior Embed employee whether one of the documents provided to all Embed shareholders related to so-called "golden parachute" payments "show[s] how much I am getting [under the retention payment agreement.]"  She confirmed to Giles that the document reflected a $55 million bonus, due to him at closing, and then asked whether that was "what [he] was expecting."  Giles replied that it was, but that "hopefully people don't read it in too much detail[.]"

47.     On June 24, 2022, another senior employee at Embed wrote to his supervisor that he was concerned by the fact that the retention payment agreement stated that each Embed

---

[4]     The Retention Incentive Award Agreements provide that the bonuses are to be paid in five installments beginning on September 30, 2023.

employee had been "encouraged" to seek their own legal counsel but that Giles had told them there was no need to consult independent counsel.  He wrote:  "Seemingly the only reason I can come up with to [explain Giles] tell[ing] us to not get legal counsel is if there is some fast track timeline he has that he's trying to rush through."  That same day, the employee's supervisor asked Giles when employees "need to sign their docs."  Giles replied:  "[A]s soon as possible[.]"

## III.   The FTX Insiders Created Misleading Records To Obscure Alameda's Role in Funding the Embed Acquisition.

48.    The FTX Insiders acquired the funds to purchase Embed in a self-dealing, opaque manner designed to obscure the malfeasance that ultimately led Plaintiffs to file a Chapter 11 Case.  Specifically, the FTX Insiders created false and misleading records suggesting that the funding for the Embed acquisition by WRS had come personally from the Defendants, even though the funds used to acquire Embed had been transferred from an Alameda bank account to a WRSS bank account and ultimately to a WRS bank account.  The Defendants did this to justify transferring to themselves WRS shares, which they expected to appreciate in value as a result of the Embed acquisition.

49.    On July 25, 2022, Ellison, as CEO of Alameda, signed promissory notes for $200 million in "loans" to Bankman-Fried (Alameda's sole director through September 6, 2022), Singh, and Wang.  Although these notes purported to memorialize massive "loans" to each individual Defendant, they did not include any repayment schedule or other detailed terms regarding repayment.  In fact, each document is only slightly more than a page in length.  The notes simply required repayment by the Defendants on the five-year anniversary of the loans, at an annual "simple interest rate of the mid-term AFR."  To date, none of the Defendants has repaid so much as $1 on these "loans."  The one-sided, scant terms and lack of any accountability or repayment schedule demonstrate that these promissory notes were not intended

to create meaningful or enforceable obligations.  They were instead intended to paper over (however thinly) the Defendants' theft of Plaintiffs' funds.

50.    One day later, on July 26, 2022, the FTX Insiders engaged in a series of transactions on the FTX.US exchange to create the appearance that Alameda had transferred a total of $200 million to the Defendants, who then transferred that same amount to WRS.  In reality, these on-exchange transactions did not involve transfers of any fiat or cryptocurrency. Instead, they were simply designed to create the illusion that amounts corresponding to the $200 million in promissory notes had been transferred to WRS by the Defendants.

51.    In fact, on July 26, 2022, $200 million was transferred from a bank account controlled by Alameda at Signature Bank to a bank account controlled by WRSS at Signature Bank.  That WRSS account, in turn, transferred $200 million to a bank account controlled by WRS at Signature Bank.  This same flow of funds was repeated on September 29, 2022, this time involving a $50 million transfer made pursuant to a second round of "loans," with accompanying promissory notes, from Alameda to the Defendants.  For unknown reasons, the on-exchange transfers related to the $200 million transfer involving the Defendants' accounts did not repeat for this $50 million transfer.

52.    All of the funds were transferred to the Embed Equity Holders to complete the acquisition.  But no money used by WRS to acquire Embed originated with Bankman-Fried, Singh, or Wang, notwithstanding the promissory notes purporting to reflect "loans" from Alameda to the Defendants and the on-exchange transfers to their personal accounts.  All of the money came from Alameda, which by this time had been used by the Defendants to misappropriate billions of dollars from FTX.com.

**Misleading FTX.US Exchange "Transfers"**



**Actual Flow of Funds**

53.     Despite the fact that the funds used by WRS to acquire Embed came from Alameda (via WRSS), the Defendants personally received SAFEs from WRS, purportedly in consideration for the transfers, on both July 25, 2022 and September 30, 2022.  The SAFEs provided that each of Bankman-Fried, Singh, and Wang would "automatically" receive an amount of WRS common stock in accordance with the size of their supposed capital contributions to WRS no later than December 31, 2022, or upon an "earlier . . . Dissolution Event[.]"  When WRS filed its Chapter 11 Case on November 14, 2022, the SAFEs automatically converted into WRS common stock.[5]

54.     The Defendants did not intend or have the ability to repay these funds to Alameda, and Alameda did not intend or have the ability to repay the funds that it had taken from FTX.com at the FTX Insiders' direction using the "special privileges" the FTX Insiders had

---

[5]     The SAFEs provide the following formula for the automatic conversion into WRS shares: "[T]his Safe will automatically convert into the number of shares of Standard Stock equal to the Purchase Amount divided by the greater of: (i) the Minimum Valuation; or (ii) (if applicable) the highest price per share of Standard Stock sold in an Equity Financing in 2022."

created for Alameda.  In addition, it appears that neither Ellison nor anyone else at Alameda—other than Bankman-Fried acting as the sole (and interested) director of Alameda—ever considered whether the "loans" benefited Alameda as a corporate entity distinct from WRS.  Any gains generated by the Embed acquisition above the amount of the "loans" (assuming they would ever be repaid) would have accrued directly to the Defendants via their equity stakes in WRS.

**IV.    A Mere Four Months After WRS's $220 Million Acquisition of Embed, No Bidder Is Willing To Pay More Than $1 Million for the Company.**

55.     On January 12, 2023, as part of the Chapter 11 Cases, the Court authorized certain procedures proposed by the Debtors with respect to running a sale process for Embed in an attempt to recover assets for the Debtors' estates.  [D.I. 487].

56.     Less than four months after the closing of the Embed acquisition, the Debtors received twelve non-binding Initial Indications of Interest ("IOIs") to purchase the company, submitted after limited financial and commercial due diligence, with an average value of approximately $35 million—far less than the $220 million that WRS had paid for Embed only a few months earlier.

57.     The highest IOI was valued at $78 million, only about one-third of the price that WRS had paid for Embed.  The lowest IOI was valued at $10 million, less than one-twentieth of the price that WRS had paid.

58.     Giles himself submitted an IOI to purchase Embed valued at $11 million, but his final bid for Embed, submitted to the Debtors on March 23, 2023, was for only $1 million and was subject to potential reductions at closing.

59.     Of the eleven other potential bidders, only one submitted a final bid after conducting more comprehensive due diligence, for a mere $250,000, and only for Embed's assets; the Debtors would have been left responsible for all of Embed's liabilities.

60.     The potential bidders who did not submit final bids cited the fact that Embed's platform and technology had limited scope and features, and that it would take several years and significant resources to build Embed into an enterprise-grade company.

61.     The result of the bidding process—including Giles' own bid of $1 million, or 0.45% of the purchase price that WRS had paid just a few months before—leaves no doubt that the $220 million paid by WRS to acquire Embed was wildly inflated relative to the company's fair value, which Giles well knew.  The bidders had figured out what the FTX Group and FTX Insiders did not bother to assess prior to the Embed acquisition, namely, that Embed's vaunted software platform was essentially worthless.

## V.      The Transfers Were Made When Plaintiffs Were Insolvent, and the FTX Insiders Knew It.

62.     At the time the SAFEs were transferred to the Defendants, and at the time the SAFEs held by the Defendants automatically converted into shares of WRS common stock for the Defendants, each of the Plaintiffs:  (1) was insolvent; (2) became insolvent as a result of the transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

63.     On November 8 and November 9, 2022, Bankman-Fried and Wang attempted to produce a reconciliation of WRSS's assets and liabilities, the vast majority of which were customer deposits, at the urging of other FTX Group senior personnel.  Their reconciliation showed a shortfall of WRSS's assets below its liabilities of approximately $46 million.  The Debtors' preliminary analysis indicates that this shortfall may have been as much as $128 million as of the Petition Date.  [D.I. 792-1].

64.     The other FTX Group entities involved in the acquisition of Embed were also insolvent at all relevant times.  As Singh admitted in his guilty plea, by "early September 2022," the same month the Embed acquisition closed, Alameda "could not repay what it owed."  *See* Plea Tr. 29:2-3, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102.

65.     Ellison made similar admissions in her guilty plea, stating that:  (a) from 2019 through 2022, Alameda used FTX.com funds to finance investments or repay loans; (b) from July 2022 through at least October 2022, she agreed with Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders; and (c) she had understood that Bankman-Fried and others had made investments with funds from FTX.com in the name of Alameda in order to conceal the true source of those funds.

66.     On December 13, 2022, Bankman-Fried was charged in the Southern District of New York in an eight-count indictment with federal offenses during the period from 2019 through November 2022, arising out of, among other things, the Defendants' use of Alameda to misappropriate FTX.com funds and Bankman-Fried's misrepresentations to lenders and investors about the financial condition of Alameda, FTX.com, and FTX.US.  The United States Attorney for the Southern District of New York filed a superseding indictment on March 28, 2023 that included an additional count for conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act.

## VI.     The Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent To Hinder, Delay, or Defraud Creditors.

67.     As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the transfers made and obligations incurred in connection with the acquisition of Embed, including that:

i.      The transfers were part of a scheme to enrich and otherwise benefit the
        Defendants;

ii.     Numerous material facts relating to the transfers were concealed;

iii.    Defendants removed or concealed Plaintiffs' assets;

iv.     The value of the consideration received by Plaintiffs was not reasonably
        equivalent to the value of the assets transferred or the amount of the obligations
        incurred;

v.      Plaintiffs were insolvent when, or became insolvent shortly after, the transfers
        were made; and

vi.     The transfers occurred shortly before or shortly after Plaintiffs incurred
        substantial debts.

## CAUSES OF ACTION

### COUNT ONE
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
### 11 U.S.C. § 548(a)(1)(A)

68.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 67 as if fully

set forth here.

69.     On November 14, 2022—the Petition Date for WRS—the SAFEs that were

transferred to Defendants on July 25, 2022 and September 30, 2022 automatically converted,

pursuant to their terms, into WRS common stock, thereby effecting a transfer of WRS common

stock to Defendants.

70.     Each of these transfers and obligations to Defendants was made with the intent to

hinder, delay, or defraud present or future creditors.

71.     Accordingly, each of these transfers and obligations should be avoided as

fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover

from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs

and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWO**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**11 U.S.C. § 548(a)(1)(B)**

72.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 71 as if fully set forth here.

73.    On November 14, 2022—the Petition Date for WRS—the SAFEs that were transferred to Defendants on July 25, 2022 and September 30, 2022 automatically converted, pursuant to their terms, into WRS common stock, thereby effecting a transfer of WRS common stock to Defendants.

74.    Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers and obligations.

75.    Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

76.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT THREE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**

77.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

78.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

79.     On November 14, 2022—the Petition Date for WRS—the SAFEs that were transferred to Defendants on July 25, 2022 and September 30, 2022 automatically converted, pursuant to their terms, into WRS common stock, thereby effecting a transfer of WRS common stock to Defendants.

80.     Each of these transfers and obligations to Defendants was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.  Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims.

81.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT FOUR
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)

82.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 81 as if fully set forth here.

83.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

84.     On November 14, 2022—the Petition Date for WRS—the SAFEs that were transferred to Defendants on July 25, 2022 and September 30, 2022 automatically converted, pursuant to their terms, into WRS common stock, thereby effecting a transfer of WRS common stock to Defendants.

85.     Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers and obligations.

86.     Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiff's ability to repay as such debts became due.

87.     Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

88.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from

the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors'

bankruptcy estates.

## COUNT FIVE
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
### 11 U.S.C. § 548(a)(1)(A)

89.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 88 as if fully

set forth here.

90.     On July 25, 2022 and September 30, 2022, Plaintiffs transferred to Defendants

SAFEs that entitled them to WRS common stock.

91.     Each of these transfers and obligations to Defendants was made with the intent to

hinder, delay, or defraud present or future creditors.

92.     Accordingly, each of these transfers and obligations should be avoided as

fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover

from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs

and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT SIX
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
### 11 U.S.C. § 548(a)(1)(B)

93.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 92 as if fully

set forth here.

94.     On July 25, 2022 and September 30, 2022, Plaintiffs transferred to Defendants

SAFEs that entitled them to WRS common stock.

95.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the

transfers and obligations.

96.     Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

97.     Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SEVEN**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**

98.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 97 as if fully set forth here.

99.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

100.    On July 25, 2022 and September 30, 2022, Plaintiffs transferred to Defendants SAFEs that entitled them to WRS common stock.

101.    Each of these transfers and obligations to Defendants was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold

allowable unsecured claims.  Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims.

102.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT EIGHT
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)

103.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 102 as if fully set forth here.

104.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

105.    On July 25, 2022 and September 30, 2022, Plaintiffs transferred to Defendants SAFEs that entitled them to WRS common stock.

106.    Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers and obligations.

107.    Each of the Plaintiffs:  (1) was insolvent on the date that each transfer and obligation was made; (2) became insolvent as a result of these transfers and obligations;

(3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiff's ability to repay as such debts became due.

108.    Each of the transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

109.    Accordingly, each of these transfers and obligations should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT NINE
### PREFERENTIAL TRANSFER PURSUANT TO 11 U.S.C. § 547(b)

110.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 109 as if fully set forth here.

111.    On November 14, 2022—the Petition Date for WRS—the SAFEs that were transferred to Defendants on July 25, 2022 and September 30, 2022 converted, pursuant to their terms, into WRS common stock, thereby effecting a transfer of WRS common stock to Defendants.

112.    The conversion of the SAFEs into WRS common stock constituted transfers for the benefit of a creditor or creditors of Plaintiffs.

113.    Each of these transfers was made on account of an antecedent debt owed by Plaintiffs to Defendants pursuant to SAFEs that were dated as of July 25, 2022 and September 30, 2022.

114.    Each of these transfers was made on or within ninety (90) days of the Petition Date.

115.    Each of these transfers was made to insiders (within the meaning of 11 U.S.C. § 101(31)(B)).

116.    Each of these transfers was made while Plaintiffs were insolvent.

117.    Each of these transfers enabled Defendants to receive more than they would have received if:  (i) Plaintiffs' Chapter 11 Case was a case under Chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) the amount paid to Defendants on account of the debt were determined by the Bankruptcy Code.

118.    Defendants have not returned any portion of WRS common stock transferred to them pursuant to the SAFEs.

119.    Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence in the circumstances of the case and have taken into account known or reasonably knowable affirmative defenses and believe that these transfers are avoidable.

120.    Accordingly, each of these transfers should be avoided as a preference pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from Defendants the full amount of the transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TEN**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**

121.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 120 as if fully set forth here.

122.    As alleged above, Plaintiffs are entitled to avoid each of the transfers addressed herein under Sections 544, 547, and 548 of the Bankruptcy Code.

123.     Because Defendants are the initial transferees or the entities for whose benefit such transfers were made, Plaintiffs may recover from Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT ELEVEN**
**DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**

124.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 123 as if fully set forth here.

125.     As alleged above, Defendants are transferees of transfers and recipients of obligations avoidable under Sections 544, 547, and 548 of the Bankruptcy Code and entities from which property is recoverable under Section 550 of the Bankruptcy Code.

126.     By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, any claims of Defendants that have been or will in the future be asserted in these Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property, for which and to the extent that the Court has determined Defendants are liable pursuant to 11 U.S.C. § 550.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

127.    Enter an order that the transfers and obligations addressed herein are avoidable fraudulent transfers and obligations, and/or preferences, under 11 U.S.C. §§ 544, 547, and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

128.    Award Plaintiffs under 11 U.S.C. § 550 the transferred WRS common stock (plus the value of any additional avoidable transfers that Plaintiffs learn, through formal discovery or otherwise, were made to Defendants);

129.    Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants relinquish to Plaintiffs the amount ordered as an award for avoidable transfers;

130.    Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

131.    Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated: May 17, 2023
     Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       mcguire@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (*pro hac vice* pending)
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
       dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       dunnec@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*